THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v.
CHARLES E. SCHULDT III, Defendant-Appellant.

Third District   No. 3—90—0627

Opinion filed August 23, 1991.—Modified opinion
filed September 16, 1991.

Greg G. Chickris, of East Moline, for appellant.

Marshall E. Douglas, State's Attorney, of Rock Island (Terry A. Mertel, of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE HAASE delivered the opinion of the court:

A jury convicted the defendant, Charles E. Schuldt III, of aggravated criminal sexual assault and criminal sexual assault (Ill. Rev. Stat. 1989, ch. 38, pars. 12—14(a)(2), 12—13(a)(1)). The court thereafter sentenced him to serve eight years in prison. The defendant appeals.

The complainant testified at the defendant's trial that on August 20, 1989, around 4 a.m., she approached the defendant in a bar. She and the defendant had had a sexual relationship in 1985 when the victim was a college student and the defendant was in high school. The couple left the bar about 4:07 a.m. and drove to the victim's apartment. The victim noted that she wanted to show the defendant her new apartment, which at the time had no lighting because the utilities

were not yet hooked up. When the victim began to show the defendant around the apartment, the defendant hugged and kissed her. She, however, backed off. About five minutes later, the couple left.

According to the victim, she and the defendant then drove to the defendant's apartment. She went inside with the defendant apparently to use the bathroom. When she attempted to leave, the defendant grabbed her and tried to hug and kiss her. The victim resisted, but the defendant overpowered her and dragged her into the bedroom. She tried to scream, but the defendant put his hand over her mouth and pinched her nose shut. He eventually promised to let her breathe when she agreed not to scream. He then pushed her down on the bed, tied her hands behind her back with a shoelace, and placed a washcloth in her mouth. The victim noted that she babbled incoherently throughout the assault, but did not yell. The defendant subsequently removed all of the victim's clothing, including her shirt. He removed her bra by cutting the straps with a knife.

The victim testified that the defendant then had anal intercourse with her. While doing so, he rubbed a knife blade across her back. After about 10 minutes, he struck her with a coat hanger, slapped her twice, and bit her twice. Thereafter, the defendant committed numerous acts of sexual assault upon her. In all, the defendant forced her to have anal intercourse four times and vaginal intercourse once. He also forced her to perform oral sex twice.

The victim further testified that at some point during the course of the assault, the defendant took her to the bathroom, placed her in the bathtub in two or three inches of water, and washed the area between her legs. The assault finally ended when she faked a cramp.

The victim also testified that, after the incident, the defendant dressed her and they left the apartment together. The victim gave the defendant a ride back to his truck. At that point, the sun had risen. The victim then went to Marty Wilson's house. She told Wilson what had happened and she was eventually taken to the hospital.

Marty Wilson testified that the victim came to his apartment about 7 a.m., crying and hysterical. After he called the Rape Crisis Center and the victim's parents, she was taken to the hospital.

Dr. Forest King, director of emergency services at the hospital, testified that he examined the victim on August 20, 1989. King noted that the victim had numerous scratches, bruises, and abrasions to the buttocks area. The victim also had a bruise-type injury near her rectum consistent with anal penetration. Dr. King opined that the victim's injuries could be consistent with either consensual or nonconsensual sex.

Forensic serologist Kevin Zeeb testified that a washcloth recovered from the defendant's apartment showed an ABO, ABH substance type present. He concluded that the substance could have originated from the victim but could not have originated from the defendant.

Police officer Michael Noon testified that he searched the defendant's apartment on August 20, 1989. From the defendant's bedroom, the officer seized a paring knife, a coat hanger, a washcloth, and shoelaces. One portion of the shoelaces was found hanging behind the headboard and the other was found on the floor.

The defendant testified that he terminated his previous dating relationship with the victim because she was getting too serious. At the bar on the night in question, the victim reacquainted herself with the defendant and invited him to her table, where they talked for a while. They left the bar together when the victim asked him if he would go somewhere with her and talk. He accepted, and she drove him to her apartment about five miles away.

According to the defendant, he and the victim kissed for about two minutes while inside her apartment. The defendant then asked the victim if she wanted to "do it." She replied "no, not here." She also stated that the other people in the apartment house might hear. Thereafter, the victim drove the defendant to his apartment in Rock Island, which was about three miles away.

The defendant further testified that at his apartment, the couple kissed for a few minutes. The defendant then asked if she wanted to have sex. She said yes and asked the defendant if he had ever been tied up before. They then went into the bedroom and removed all their clothes. The victim repeatedly asked the defendant if he wanted to be tied up, but the defendant declined. She then asked the defendant to tie her up. Thereafter, the defendant took some shoestrings and did so.

According to the defendant, the victim asked him to slap her. He complied, but the victim complained that he did not slap her hard enough. The defendant then grabbed a hanger and hit her on the buttocks three times. Finally, the defendant became disgusted with the situation and cut her loose with a knife. Thereafter, the couple engaged in consensual sexual relations. During the course of performing oral sex on the defendant, the victim became agitated and told the defendant that she would perform it her way or not at all. She then tied the defendant's hands together behind his neck to the bed frame with her bra. After performing more oral sex, she took a shower leav-

ing the defendant tied to the bed. The defendant then cut himself loose.

The defendant also testified that eventually he and the victim left the apartment together. The victim, however, went back inside to retrieve her bra. She became upset when she discovered it had been cut. She then drove the defendant back to the tavern. By that time it was light, but the sun had not yet risen. When the victim dropped the defendant off at the bar, the defendant told her he felt bad about cheating on his girl friend. At that point, the victim cursed him and drove away.

Gwen and Rudy Sajak testified that they lived next door to the defendant. Gwen awoke about 4:50 a.m. on the day in question. She noticed that the defendant's bedroom light was on. She stated that she had not heard any noise coming from the defendant's apartment, even though her windows and the defendant's windows were both open. She also noted that she had walked her dog within five feet of his bedroom window and had not heard anything unusual. About 5:30 a.m., she saw a car, which had been parked in front of the defendant's house, drive away.

On appeal, the defendant first argues that he was not proved guilty beyond a reasonable doubt. He contends that the victim's testimony regarding numerous aspects of the incident was insufficient, incredible, confused, and contradicted. For example, he notes that the victim claimed she was overpowered yet there was no evidence that she was injured from resisting. He further notes that the other witnesses contradicted the victim's testimony regarding the time frame of the incident, whether the sun had risen, and whether she was hysterical afterwards. Additionally, the defendant claims that it was physically impossible for the defendant to remove the victim's blouse from her while her hands were tied behind her back.

It is well settled that when presented with a challenge to the sufficiency of the evidence, it is not the function of a reviewing court to retry the defendant; the relevant question is whether after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. (*People v. Collins* (1985), 106 Ill. 2d 237, 478 N.E.2d 267.) The reasonable doubt test as announced in *People v. Collins* is the proper standard of review in all criminal cases. (*People v. Pintos* (1989), 133 Ill. 2d 286, 549 N.E.2d 344.) We join recent decisions by the first district (*People v. Byrd* (1990), 206 Ill. App. 3d 996, 565 N.E.2d 176); fourth district (*People v. Evans* (1990), 199 Ill. App. 3d 330, 556 N.E.2d 904); and fifth district (*People v. Meador*

(1991), 210 Ill. App. 3d 829), in holding that the proper standard of review in sex offense cases is the reasonable doubt test as announced in *People v. Collins.*

■ After reviewing the evidence in the light most favorable to the prosecution, we find that a rational trier of fact could have found the defendant guilty beyond a reasonable doubt. The outcome of the case rested upon the credibility of the witnesses. The trier of fact was fully aware of the inconsistencies in the victim's testimony, yet it nevertheless chose to believe her version over the story given by the defendant. The victim's testimony, although somewhat inconsistent with her previous statements, was detailed and unwavering regarding the defendant's conduct during the commission of the offenses. We further find that any discrepancies in the time frame of the incident were minor and did not detract from the reasonableness of her story as a whole. See *People v. Redman* (1986), 141 Ill. App. 3d 691, 490 N.E.2d 958.

We also find unpersuasive the defendant's claims that some of the victim's testimony was incredible. In that regard, we note that removal of the victim's knit blouse could have been facilitated when her arm was momentarily freed. We further note that the jury could have reasonably concluded that the victim was unable to scream because she had been gagged by the defendant, and that she did not resist to the point of injury because she feared that the defendant would seriously injure her. Under the circumstances, we do not find that the evidence was so improbable as to raise a reasonable doubt about the defendant's guilt.

The defendant next argues that the trial court erred in denying his motion to suppress. He contends that the police unlawfully seized shoelaces from his apartment during a second search of his apartment. He further contends that reversal is required because of the trial court's failure to state findings of fact and conclusions of law in rendering its decision.

■ We initially note that the defendant erroneously contends that reversal is required because of the court's failure to state findings of fact and conclusions of law. The absence of findings of fact and conclusions of law does not require reversal if the evidence would sustain the ruling of the trial court. *People v. Dickerson* (1979), 69 Ill. App. 3d 825, 387 N.E.2d 806.

In the instant case, a search warrant was issued on the day of the crime to retrieve several items from the defendant's apartment, including shoelaces or other items used to tie the victim. The warrant was executed that afternoon and the shoelaces in question were dis-

covered, seized, tagged, and placed in a paper bag. Many other items were also seized and placed in bags at the scene. However, the bag with the shoestrings and Officer Noon's notebook were inadvertently left in the defendant's apartment. A short time after the search was concluded, Officer Noon realized that he had left his notebook inside the apartment. After securing permission from the owner, he reentered the apartment through a window and retrieved the notebook. When the police returned to the police station, they discovered that the shoelaces were also left behind. They then called the owner to ask for permission to reenter the apartment and get the bag containing the shoelaces. The owner told the officers that he would have to consult an attorney before giving permission. When the owner had not returned their call for some time, the officers went to the defendant's apartment, let themselves in through a window, and retrieved only the bag containing the shoelaces.

We note that Federal courts have held that where police make a second entry pursuant to a valid warrant, the second search is a continuation of the first and does not violate the fourth amendment. (*United States v. Bowling* (6th Cir. 1965), 351 F.2d 236; *United States v. Carter* (8th Cir. 1988), 854 F.2d 1102; *United States v. Kaplan* (9th Cir. 1990), 895 F.2d 618.) In *Carter*, the police returned several hours after the initial search to retrieve an item listed in the search warrant. The court held that the authority of the warrant had not expired, and therefore, the return search was not beyond the scope of the fourth amendment.

Similarly, in the instant case, we find that although the officers' retrieval of the shoelaces was somewhat inept, it was not beyond the scope of the fourth amendment. The items here had previously been seized, tagged, and inadvertently left behind. The police retrieved the items several hours later only after attempting to gain entry with the permission of the owner of the premises. Under these circumstances, we find that the trial court's decision denying the defendant's motion to suppress was proper.

The defendant next contends that the trial court erred in refusing to allow testimony from the defendant's neighbors that they observed and heard the police search the defendant's apartment when they retrieved the shoelaces. He further contends that the offered evidence was relevant because it showed that the neighbors could hear and observe activities at his residence.

Evidence may be rejected on the grounds of relevancy if it is of little probative value because of remoteness, uncertainty or conjectural nature. (*People v. Kavinsky* (1981), 98 Ill. App. 3d 579, 424

N.E.2d 340.) Whether evidence offered by a defendant is relevant is a determination within the sound discretion of the trial court. *People v. Boyd* (1980), 81 Ill. App. 3d 259, 401 N.E.2d 304.

■ Here, we find that the neighbors' awareness of the defendant's apartment on the night following the attack was not indicative of their general awareness of the defendant's apartment. Moreover, the victim testified that the defendant had gagged her mouth and she did not scream. The neighbor's testimony that she heard the police step on a tin can outside her residence did not tend to indicate that she could hear conversations within the defendant's residence. Under the circumstances, we find that the trial court did not abuse its discretion in refusing to allow the evidence.

The defendant next argues that the trial court erred in refusing evidence concerning the details of prior sexual conduct between the victim and the defendant.

Initially we find that the trial court erroneously ruled that the so-called rape shield statute, section 115—7 of the Code of Criminal Procedure of 1963 (Code) (Ill. Rev. Stat. 1989, ch. 38, par. 115—7), bars the introduction of such testimony whenever the victim admits prior sexual activity with the defendant. However, we further find that the court did not abuse its discretion in refusing the testimony on relevancy grounds.

■ Section 115—7(a) of the Code provides that the prior sexual activity or the reputation of the alleged victim is inadmissible except as evidence concerning the prior sexual conduct of the alleged victim with the accused. In other words, the prior sexual history of the victim in relation to the defendant is admissible. The State's contention that subsection (b) of section 115—7 of the Code precludes evidence of the prior sexual activity between the defendant and victim when the victim admits such activity is a misreading of the statute. Section 115—7(b) provides that an offer of proof must be made in the event that the victim denies the prior sexual activity with the defendant. If the victim admits the prior sexual activity, then an offer of proof is not required. In the present case, the victim admitted sexual involvement with the defendant on two prior occasions in 1985. Therefore, the defendant was not precluded by statute from inquiring into the details of those incidents.

Nonetheless, we note that the determination of whether the details of the sexual activity were admissible remained subject to standards of relevancy. Here, the trial court initially required defense counsel to make an offer of proof concerning the relevancy of the details of the prior sexual activity. The court noted that the details would be

relevant if the defendant could show some type of forceful consensual sex. During the offer of proof, the victim stated that her sexual encounters with the defendant involved vaginal and not anal intercourse. Nothing in the offer of proof demonstrated the kind of sadomasochist sexual conduct described by the defendant in his testimony. After eliciting the victim's testimony, defense counsel concluded his offer of proof without presenting any evidence from the defendant to show how the defendant's testimony would differ from the victim's. Thus, it is apparent that the defendant wanted to introduce the details of the prior acts to increase the emphasis on the fact that the incidents occurred and thereby unduly prejudice the victim in the eyes of the jury.

We further note that the defendant was allowed to elicit testimony from the victim before the jury that she had had sexual intercourse with the defendant twice in 1985. Under the circumstances, any further details concerning incidents that occurred four years ago were not relevant to the issue of whether the victim consented to sex with the defendant on August 20, 1989. Accordingly, we will not disturb the trial court's decision to exclude the evidence.

The defendant next contends that the trial court erred in allowing leading questions with the victim.

The test of a leading question is whether it suggests the words or thought of the answer. (*People v. Cobb* (1989), 186 Ill. App. 3d 898, 542 N.E.2d 1171.) The use of a leading question does not warrant reversal of a conviction unless it is shown that the trial court abused its discretion and that such abuse resulted in substantial injury to the defendant. (*People v. Taylor* (1971), 132 Ill. App. 2d 473, 270 N.E.2d 628.) A leading question does not harm the defendant if the question asked did not involve material information. *People v. Cobb* (1989), 186 Ill. App. 3d 898, 542 N.E.2d 1171.

██ After reviewing the record, it appears that some of the prosecutor's questioning was leading. However, we find that under the circumstances presented here, any error was harmless and does not require reversal.

The defendant next argues that the trial court committed reversible error in questioning two defense witnesses. In that regard, he points out that the trial court inquired about whether the defendant's wife had ever heard anyone at the bank where she worked discuss the defendant's reputation for chastity. The defendant also points out that the court questioned the defendant's mother about the ability of the defendant's bathtub to hold water.

We note that it is well settled that a trial judge may ask questions of a witness in order to clarify the evidence. (*People v. Enoch* (1989), 189 Ill. App. 3d 535, 545 N.E.2d 429.) Furthermore, an extensive examination by the judge may be justified if he has reason to believe that a witness is not telling the truth; the court, however, must not forget its judicial function and assume the role of an advocate.

■ The State claims that the defendant waived any error concerning the court's questioning of the defendant's wife. We agree, since the defendant failed to raise an objection to the questioning at trial. *People v. Long* (1968), 39 Ill. 2d 40, 233 N.E.2d 389.

Turning to the questioning of the defendant's mother, we find that the court's questioning was merely an attempt to clarify why the defendant's bathtub would not hold water. The testimony also clarified whether the defendant had an external stopper. Accordingly, we find that the trial court's questioning and comments were not improper.

The defendant next argues that the trial court improperly restricted or excluded the defendant's reputation evidence. Among other things, he claims that the court improperly struck the defendant's employer's testimony that the defendant had a good reputation for refraining from sexual assault.

■ In the instant case, the prosecutor objected when defense counsel asked the defendant's employer if the defendant had a good reputation with regard to nonviolence to women. The trial court did not strike the answer, but asked defense counsel if he wished to rephrase the question. Defense counsel agreed to rephrase the question and then asked the witness if the defendant had a good reputation with regard to refraining from sexual assault. The trial court struck the witness' affirmative response to that question. Thereafter, the trial court allowed defense counsel to ask the witness if the defendant had a good reputation for decency and morality.

In *People v. Partee* (1974), 17 Ill. App. 3d 166, 308 N.E.2d 18, the court noted that in sex crimes, the traits involved, and as to which the accused may introduce evidence of his good character, are chastity, morality and decency. The court further noted that counsel cannot inquire of a negative attribute of character, and infer that its absence is sufficient to lay a proper foundation for a good reputation.

Similarly, in the instant case, defense counsel was really trying to inquire into a negative character trait (*i.e.*, nonviolence to women) and infer from its absence that the defendant had a good reputation. Accordingly, we find that the trial court did not abuse its discretion in excluding the evidence.

We find that the other exclusions of character evidence were also proper, since they were personal opinions and not based on the defendant's reputation in the community. However, even assuming that the trial court erred in restricting some of the evidence, the error was harmless. The defendant introduced character evidence from 10 different witnesses. Under the circumstances, the court's striking of some of the character evidence was harmless. See *People v. Bartall* (1983), 98 Ill. 2d 294, 456 N.E.2d 59.

Lastly, the defendant argues that the trial court abused its discretion in excluding evidence that the victim took a "morning after" pill at the hospital following the sexual assault.

■ We find that evidence about whether the victim took birth control pills was not relevant. It is logical that a woman would take a morning after pill if she was raped, even if she had been taking other birth control pills. The proffered evidence did not tend to make any issue in dispute more or less likely. Accordingly, we find that the trial court did not abuse its discretion in excluding that evidence.

The judgment of the circuit court of Rock Island County is affirmed.

Affirmed.

STOUDER, P.J., and SLATER, J., concur.