THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellant, v.
GEORGE HINTON, Defendant-Appellee.

Third District    No. 3—92—0792

Opinion filed August 19, 1993.

James Glasgow, State's Attorney, of Joliet (John X. Breslin and Lawrence Michael Kaschak, both of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

Mason, Orloff, Reich, Troy & Thanas, of Joliet (Richard B. Orloff, of counsel), for appellee.

JUSTICE LYTTON delivered the opinion of the court:

The defendant was charged in a two-count indictment with the offenses of unlawful possession of a controlled substance and armed violence. The defendant filed a motion to suppress evidence, and the trial judge granted the motion. Thereafter, the State filed this appeal. We affirm.

On December 7, 1989, the defendant was charged with the offenses of unlawful possession of a controlled substance (cocaine). The defendant was also charged with armed violence, in that he had a .22-caliber revolver at the time that he possessed the controlled substance. On May 22, 1990, the defendant filed a motion to suppress. The motion alleged (a) at approximately 3:30 a.m. on December 7,

1989, Joliet police officer Michael Trafton entered the defendant's car while it sat in a Pizza Hut parking lot with the defendant sleeping therein, (b) entrance of the vehicle was without the defendant's authorization and without a search warrant, (c) at the time of the entry, there existed no outstanding arrest warrants for the defendant, (d) at the time of the entry, the officer did not possess reasonable grounds to believe that the defendant had any contraband or illegal substance, (e) after the officer approached the defendant and awoke him, the officer ordered the defendant out of the vehicle, at which time the officer viewed a weapon under the seat, and (f) further search of the vehicle resulted in the officer's finding the alleged cocaine.

A hearing was conducted on defendant's motion to suppress on October 5, 1992. The defendant testified that, upon his separation from the Navy, he began to work at the Pizza Hut on West Jefferson Street in Joliet, Illinois. In December of 1989, he was a shift manager responsible for opening and preparing the restaurant. On December 7, 1989, someone else had the defendant's keys to the restaurant, but another worker was supposed to arrive at 7 a.m. Several hours before, at approximately 3:30 a.m., the defendant's car was parked in front of the Pizza Hut door, and the defendant was asleep inside. The defendant testified that he had been up late and didn't want to take a chance of going to sleep and not being there to open the store and take care of his responsibilities.

The defendant was positioned in the front driver's seat, with the seat slightly reclined. His car was a four-door vehicle, and the side and rear windows were tinted.

The first thing the defendant recalls was hearing his door open and cold air coming in and waking him up. He looked to see who was at his door and heard a voice telling him to get out of the car. It was a Joliet police officer. The defendant asked why the officer wanted him out of the car, and he was again told to get out of the car.

As the defendant got out of the car, the officer grabbed him by one arm and pushed him toward another police officer who was near the front of the vehicle. The first policeman then went back and started looking through the defendant's car. After a couple of minutes, the officer came back and said that he had found a gun. The officer then told the other policeman to handcuff the defendant and put him in the police car.

The defendant stated that, at the time he was awakened, the gun was under his driver's seat. The weapon was not visible. The defendant also testified that, while seated in the car a person could see out,

but a person outside the car could not see in because of the tinted windows.

Joliet police officer James Stoddard testified that, at approximately 3:30 a.m., on December 7, 1989, he received a radio dispatch from Officer Trafton, who said that he needed help with a suspicious vehicle. Stoddard responded as a backup unit. When Stoddard arrived, Trafton told him that he was going to check out this vehicle and that there was a weapon in plain sight in the console of the vehicle. Stoddard couldn't recall whether the defendant was already outside of the vehicle and whether the defendant was already in handcuffs when Stoddard arrived. Eventually, Officer Trafton turned over the gun to Stoddard, who also transported Hinton to the police station.

Officer Jeff Allbert testified that, on November 25, 1991, he issued a citation against the defendant, because the side and rear windows of the defendant's vehicle were tinted very dark. Similarly, Officer James Reilly testified that, on February 21, 1991, he made a traffic stop of the defendant's vehicle because the tinting of the car's windows was darker than usual. To alleviate the need for other officers' testimony, the parties stipulated that other policemen would testify that other citations were issued on various dates for obstructed view because the dark tinting of the vehicle's windows. The defendant received four such citations.

The prosecution called Joliet police officer Michael Trafton as a witness. Trafton testified that, on December 7, 1989, he was working the midnight shift. He noticed a car parked in the Pizza Hut parking lot, with the engine running but the lights off. Trafton radioed that he was going to be checking out the vehicle. Thereafter, he walked up to the car and noticed that the driver was asleep. Utilizing his flashlight, Trafton looked inside the vehicle. The officer testified that he observed a handgun, silver or chrome with black handles, between the driver's feet. The officer called for assistance and waited for another unit to arrive.

Trafton stated that he woke the driver by pounding on the door and window. He asked the driver to step out of the vehicle with his hands in the air. The driver exited the vehicle and was taken into custody. When asked who took the driver into custody, Trafton testified, "I don't recall if it was myself or Officer Stoddard, or both simultaneously. I really cannot remember." After the defendant was in custody, Trafton reached down and took the gun out of the car. He handed the gun to Stoddard. While Trafton inventoried the rest of the vehicle, Stoddard transported the prisoner.

Trafton did not observe anything unusual about the Pizza Hut. He didn't see any doors askew or anything that would indicate that anyone was inside the restaurant. It was not until the officer came up to the vehicle and shined his flashlight inside that he observed the gun.

Prior to investigating the vehicle, Trafton radioed the police station that he observed a vehicle running in a parking lot, and that he was going to investigate for possible burglary or other suspicious circumstances. The radio transmission did not indicate that there was a man in a car with a gun.

When asked what purpose he had for shining the light into the vehicle, Trafton responded, "for my own safety." Trafton said that he probably could not tell that the driver was sleeping until he shined his flashlight at the person. Trafton denied that, upon seeing the sleeping driver, he opened the door and told the individual to get out. Trafton also denied that he first saw the gun after the driver was outside the vehicle.

After hearing the arguments of counsel, the trial judge found that Officer Trafton approached the vehicle, which he considered to be suspicious, under circumstances that could have related to a possible burglary. Trafton shined his flashlight through the tinted windows of the vehicle and observed the defendant sleeping. From the totality of the circumstances, the trial judge found Trafton had no probable cause to further investigate the defendant sleeping in his parked automobile. The judge also found that no justification existed for the police to be concerned about the defendant because of concern for community caretaking functions or public safety functions. Accordingly, the trial judge granted the defendant's motion to suppress the weapon and contraband. The State appealed.

On appeal, this court will not set aside a trial court's disposition of a motion to suppress unless the decision is manifestly erroneous. (*People v. Trice* (1991), 217 Ill. App. 3d 967, 974, 577 N.E.2d 1195.) As the Illinois Supreme Court discussed in *People v. Murray* (1990), 137 Ill. 2d 382, 387-88, 560 N.E.2d 309, there are three theoretical tiers of police-citizen encounters. The first tier involves an arrest of a citizen, supported by probable cause, without which the fourth amendment prohibition against unreasonable seizures is violated. (*Henry v. United States* (1959), 361 U.S. 98, 4 L. Ed. 2d 134, 80 S. Ct. 168.) The next tier involves the so-called *"Terry"* stop, a brief seizure that must be supported by reasonable suspicion of criminal activity to be within acceptable fourth amendment boundaries. (*Terry v. Ohio* (1968), 392 U.S. 1, 20 L. Ed. 2d 899, 88 S. Ct. 1868.) The last tier is commonly known as the community caretaking function or public

safety function. This tier involves no coercion or detention and therefore does not involve a seizure. "Local police officers *** frequently investigate vehicle accidents in which there is no claim of criminal liability and engage in what, for want of a better term, may be described as community caretaking functions ***" *Cady v. Dombrowski* (1973), 413 U.S. 433, 441, 37 L. Ed. 2d 706, 714-15, 93 S. Ct. 2523, 2528.

In *Murray*, two police officers observed the defendant asleep in a car parked on the side of a road. The officers awoke the defendant by tapping on the window, asked him to produce a driver's license, and requested that he exit the car. After the defendant exited the car, the police confiscated a gun which was seen in plain view. The defendant was subsequently charged and convicted for the offense of unlawful use of a weapon by a felon.

In reviewing Murray's conviction, the Illinois Supreme Court held that the defendant's fourth amendment rights were not violated under the facts presented in that case. The supreme court found that there was no use of physical force or show of authority which would justify finding that a seizure had occurred. Under these circumstances, the supreme court held, "it is clear that approaching the vehicle and waking the defendant by tapping on the window was not a seizure." *Murray*, 137 Ill. 2d at 392.

The situation presented in this case is distinct from that in *Murray*. Here, the trial judge ruled that Officer Trafton was not acting pursuant to community caretaking functions. Trafton's police report stated, and the trial judge found, that Trafton was acting in furtherance of an investigation for a possible burglary or other suspicious circumstances. The community caretaking function is " 'totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute.' " (*Murray*, 137 Ill. 2d at 388, quoting *Cady v. Dombrowski*, 413 U.S. at 441, 37 L. Ed. 2d at 714-15, 93 S. Ct. at 2528.) The officer told the defendant to get out of the car. When the defendant asked why, the defendant was again told to get out of the car. As our supreme court stated, "The encounter may be characterized as a seizure if the officer orders, rather than requests, that the occupant open the door or exit the car." *Murray*, 137 Ill. 2d at 393.

In this case, the trial court was left with the determination of whether the officer's conduct could be justified as either an arrest supported by probable cause or as a so-called *"Terry"* investigative stop. In making this determination, the trial judge was presented with conflicting testimony. Officer Trafton testified that while the defend-

ant slept, he shined his flashlight into the car and saw the gun. However, the defendant testified that the gun was under his driver's seat and was not visible. According to the defendant, only after he exited the car did Trafton search the car's interior and discover the gun. Unfortunately, in announcing his decision, the trial judge failed to enunciate specific findings regarding these conflicts and questions of credibility.

An order or judgment granting or denying a motion to suppress should state the findings of fact and conclusions of law upon which the order or judgment is based. (Ill. Rev. Stat. 1991, ch. 38, par. 114—12(e).) This requirement serves the salutary purpose of enlightening the appellate court as to the evidence and reasoning relied upon below and thereby facilitates review. (*People v. Bury* (1990), 199 Ill. App. 3d 207, 209-10, 556 N.E.2d 899.) While we find that the present order is deficient, we need not remand this case for compliance. The absence of sufficient findings of fact and conclusions of law does not require reversal if the evidence would sustain the ruling of the trial court. *People v. Schuldt* (1991), 217 Ill. App. 3d 534, 539, 577 N.E.2d 870.

As noted above, this court will not set aside a trial judge's disposition of a motion to suppress unless such a decision is manifestly erroneous. (*People v. Trice*, 217 Ill. App. 3d at 974.) Here, the defendant testified that, as he slept, the gun was not visible. Nonetheless, the police officer opened the car door and twice told the defendant to get out. According to the defendant, he was then grabbed and pushed toward another police officer. Only then did the arresting officer search his car and discover the gun and contraband. This testimony, if believed by the trial judge, would justify suppression on the grounds that the defendant's fourth amendment rights had been violated. Based on the record presented to this court, we cannot say that the decision below was manifestly erroneous. Accordingly, we affirm the trial judge's decision.

It is the appellant's responsibility to provide "a sufficiently complete record on appeal so that the reviewing court is fully informed regarding the issues to be resolved; in the absence of a complete record on appeal, it is presumed that the trial court's judgment conforms to the law and has a sufficient factual basis. [Citations.] Any doubt arising from the incompleteness of the record will be resolved against the appellant." (*People v. Odumuyiwa* (1989), 188 Ill. App. 3d 40, 45-46, 544 N.E.2d 405.) Prior to the filing of the notice of appeal, a simple motion by the nonprevailing party, seeking additional detailed findings of fact and conclusions of law, would have facilitated appel-

late review and perhaps focused the grounds upon which this court could review the decision below.

For the reasons stated above, the decision of the circuit court of Will County is affirmed.

Affirmed.

BARRY and STOUDER, JJ., concur.